**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT CHATTANOOGA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 1:23-cr-46 |
| v. | ) | |
| | ) | Judge Travis R. McDonough |
| JEREMY BOYD EAKER | ) | |
| | ) | Magistrate Judge Michael J. Dumitru |
| | ) | |

---

**MEMORANDUM OPINION & ORDER**

---

Before the Court are Defendant Jeremy Eaker's[1] objections (Doc. 730) to Magistrate Judge Dumitru's report and recommendation ("R&R"), recommending denial of Defendant's motion to suppress evidence and his request for a *Franks* hearing (Doc. 723). For the reasons stated below, Defendant's objections are **SUSTAINED IN PART** and **OVERRULED IN PART**.

## I. BACKGROUND

Defendant faces charges of conspiracy to distribute fentanyl and methamphetamine. (*See* Docs. 10, 632.) He moved to suppress evidence obtained from the searches conducted at 9625 Church Street ("Church Street") and 2105 Ballard Place ("Ballard Place") and for a *Franks* hearing (Doc. 655). Defendant argued that: (1) the underlying warrant affidavit ("Affidavit") submitted by DEA Agent Mills contained knowing or reckless misrepresentations and omissions warranting a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978); (2) the Affidavit relied on stale and unreliable information; (3) the Affidavit failed to establish the requisite nexus between

---

[1] Defendant Jeremy Eaker and his brother, Joshua Taylor Eaker, both face charges in this criminal matter. For purposes of clarity in this memorandum opinion, Defendant Jeremy Eaker will be referred to as "Defendant", and his brother will be referred to as "Eaker."

either address and evidence of criminal activity; and (4) the warrants were overbroad or were executed beyond their scope. (*Id.*)

Magistrate Judge Dumitru heard argument (Doc. 711) and entered an R&R (Doc. 723). Relevant here, the R&R (1) denied Defendant's request for a *Franks* hearing; (2) found an insufficient nexus between Church Street and criminal activity to establish probable cause for a search warrant; (3) found a sufficient nexus between Ballard Place and criminal activity to establish probable cause for a search warrant; and (4) concluded that the good-faith exception recognized in *United States v. Leon*, 468 U.S. 897 (1984), applied to law enforcement's searches of both properties. (Doc. 723.)

Defendant timely filed objections to the R&R. (Doc. 730.) In his objections, Defendant contends that Magistrate Judge Dumitru: (1) erred in declining to hold a *Franks* hearing; (2) wrongfully found a sufficient nexus between Ballard Place and criminal activity; and (3) erred in concluding that officers reasonably relied in good faith on the warrants for both properties. (*Id.*)

After reviewing the evidence presented for the suppression hearing *de novo*, the Court finds the facts set forth in the R&R consistent with the evidence presented. Defendant does not object to the facts stated in the R&R's background section. (*See* Doc. 730.) Accordingly, the Court **ADOPTS BY REFERENCE** those facts here (Doc. 723, at 1–6). *See, e.g.*, *United States v. Winters*, 782 F.3d 289, 295 n.1 (6th Cir. 2013) (affirming the district court's adoption of the facts set out in a magistrate judge's report and recommendation when the defendant did not object to the facts outlined by the magistrate judge).

## II. STANDARD OF REVIEW

This Court must conduct a *de novo* review of those portions of the R&R to which objections are made. 28 U.S.C. § 636(b)(1). Although the Court is required to engage in a *de*

*novo* review of specific objections, if the objections merely restate the arguments asserted in a defendant's earlier motion, which were addressed by the magistrate judge's report and recommendation, the Court may deem those objections waived. *See VanDiver v. Martin*, 304 F. Supp. 2d 934, 937 (E.D. Mich. 2004) ("An 'objection' that does nothing more than state a disagreement with a magistrate's suggested resolution, or simply summarizes what has been presented before, is not an 'objection' as that term is used in this context.").

## III. ANALYSIS

### A. *Franks* Hearing

Defendant first argues that Magistrate Judge Dumitru erred in denying his request for a *Franks* hearing because Defendant identified five statements in Agent Mills's Affidavit that were false or made with reckless disregard of the truth. (Doc. 730, at 1–2.) Defendant asserts that, absent those false statements, the Affidavit failed to establish probable cause necessary to obtain a warrant to search Ballard Place and Church Street. (*Id.*)

When determining whether to issue a search warrant, a judge "must review the affidavit according to the totality of the circumstances and make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him [or her], including the veracity and basis of knowledge of persons supplying the hearsay information, there is probable cause." *United States v. Fowler*, 535 F.3d 408, 414 (6th Cir. 2008) (citations omitted). "Probable cause, however, is not a high bar. It merely requires that an affidavit show a 'fair probability' that criminal evidence will be found in the place to be searched." *United States v. Elmore*, 18 F.4th 193, 202 (6th Cir. 2021) (citations omitted).

Nonetheless, in *Franks v. Delaware,* the Supreme Court recognized a "defendant's right to challenge the sufficiency of an executed search warrant by attacking the veracity of the

affidavit supporting the warrant." *Fowler*, 535 F.3d at 415 (citing *United States v. Atkin*, 107 F.3d 1213, 1216 (6th Cir. 1997)). "*Franks* set forth a regimented process for establishing" a "knowing or reckless falsity" in an affidavit. *United States v. Sanders*, 106 F.4th 455, 470 (6th Cir. 2024)).

Courts "start from the premise that warrant affidavits have a presumption of validity making [a defendant's] task of seeking exclusion under *Franks* a tall one." *Id.* at 470 (citation modified). To warrant a *Franks* hearing, a defendant "must first make a 'substantial preliminary showing' that the affidavit contains a knowing, intentional, or reckless falsehood." *Id.* at 470–71. Then he must show "that the affidavit would not have established probable cause without the falsity[.]" *Id.* at 471. "The bar is even higher for omissions." *United States v. Richards*, 164 F.4th 508, 519 (6th Cir. 2026). A defendant "must show that the officer making the affidavit omitted information with the intent to mislead and that those omissions were critical to the finding of probable cause." *Id.* As Magistrate Judge Dumitru explained in his R&R:

> To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence . . . or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant. Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required. On the other hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing. Whether he will prevail at that hearing is, of course, another issue.

(Doc. 723, at 12 (quoting *Franks*, 438 U.S. at 171–72)).

Defendant contends that he was entitled to a *Franks* hearing because Agent Mills's Affidavit: (1) referred to Defendant as having multiple drug-possession charges but omitted material information about the staleness of those charges; (2) falsely represented that law enforcement observed Eaker at Church Street and Ballard Place on April 14, 2022; (3) included information from a confidential source that falsely represented that Defendant paid for Church Street with drug proceeds and paid $80,000 towards Ballard Place; (4) falsely represented that co-defendants went to Ballard Place after going to a storage facility and before traveling to Atlanta where a source of supply was located; and (5) included material omissions regarding law enforcement's observation of Eaker traveling to the Church Street residence on May 9, 2022. (Doc. 730, at 1–7.)

Having conducted a *de novo* review of the record, the Court agrees with Magistrate Judge Dumitru's well-reasoned analysis and his conclusion that Defendant was not entitled to a *Franks* hearing. Although Defendant provided an affidavit from his mother, Sheri Chrisman, which takes issue with some of Agent Mills's representations in the warrant affidavit, none of Chrisman's averments are sufficient to refute the representations Agent Mills made in his affidavit or are sufficient to satisfy Defendant's burden of making a substantial preliminary showing that Agent Mills's affidavit contains a knowing, intentional, or reckless falsehood. To the extent Defendant contends that the warrant affidavit included false information supplied by a confidential source, he is still not entitled to a *Franks* hearing, because "an attack on the veracity of an informant's statements doesn't satisfy the burden to trigger a *Franks* hearing unless the defendant makes a substantial showing that the *affiant's* statements were intentionally or recklessly false." *United States v. McCarley-Connin*, 148 F.4th 808, 816 (6th Cir. 2025) (citation modified). Finally, to the extent Defendant contends that Agent Mills omitted material

information from his warrant affidavit, Defendant has not met his burden of demonstrating that Agent Mills omitted any information "with the intent to mislead." *Richards*, 164 F.4th at 519. Accordingly, the Court **OVERRULES** Defendant's objections to the R&R's conclusion that Defendant is not entitled to a *Franks* hearing.

**B. Probable Cause to Search Ballard Place**

In his R&R, Magistrate Judge Dumitru found that Agent Mills's warrant affidavit did not support a finding of probable cause for a search warrant for Church Street but found that there was probable cause for a search warrant for Ballard Place. (*See* Doc. 723, at 17–23.) Defendant objects to the latter finding. (Doc. 730, at 7–12.)

Under the Fourth Amendment, a search warrant can only be issued "upon probable cause." U.S. Const. amend. IV. "[P]robable cause is not a high bar." *Sanders*, 106 F.4th at 462 (citation omitted). It "exists when there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 461 (quoting *United States v. Grubbs*, 547 U.S. 90, 95 (2006)). "There must, in other words, be a 'nexus between the place to be searched and the evidence sought.'" *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004). Probable cause "depends on the totality of the circumstances," and there is "no model fact pattern for establishing a fair probability that contraband will be found at the place to be searched." *Sanders*, 106 F.4th at 461–62. District court judges, however, "give[] great deference to the initial determination that probable cause was present." *United States v. Simmons*, 129 F.4th 382, 386 (6th Cir. 2025) (quoting *Sanders*, 106 F.4th at 461)).

Circumstantial evidence can establish probable cause. *See Sanders*, 106 F.4th at 462. For example, probable cause exists if "officers, after observing a person leave a location, soon

find the individual possessing contraband, possibly even engaging in a sale involving the contraband, suggesting that the illicit materials came from the location." *Id.*

Several cases provide guidance on what circumstantial evidence can establish probable cause. The court in *United States v. Fitzgerald*, 754 F. App'x 351, 359–61 (6th Cir. 2018), held that the nexus between the residence searched and the evidence sought failed to establish probable cause. In *Fitzgerald*, the sixty-two-page affidavit that described an elaborate drug-trafficking operation only mentioned the defendant's residence in "six paragraphs, primarily to establish that [defendant] resided there." *Id.* at 360. The affidavit discussed only two facts about the defendant: (1) that he told a co-defendant he left an item at his house, which the affiant believed was a burner phone; and (2) that on a specific date investigators observed the defendant leave his workplace, drive to several locations, where defendant entered and exited, and then drive to his residence. *Id.* at 360–61. In deciding there was an insufficient nexus and, thus, no probable cause, the court stated that, "[t]he affidavit does not assert that [defendant] had a criminal history, provide firsthand evidence that he ever delivered or sold drugs, or demonstrate that [defendant's] residence was used as a 'stash house' or played any role in the alleged drug conspiracy, other than the single reference to [defendant's] secondary cell phone." *Id.* at 361.

In *Sanders*, there was a sufficient nexus to establish probable cause. 106 F.4th at 464. The officers in *Sanders* set up two controlled buys. *Id.* at 459–60. Before the second controlled buy, the officers surveilled the defendant. *Id.* at 460. They observed him leave his apartment, drive to the buy location, sell the drugs to the informant, and then return to his apartment. *Id.* This information was included in the search-warrant affidavit, and the Sixth Circuit held that it established a sufficient nexus between the defendant's apartment and his criminal activity. *Id.* at 463.

The Affidavit here stated that Eaker[2] would travel to Atlanta, Georgia, once every one or two weeks to purchase multi-kilogram quantities of methamphetamine and heroin/fentanyl, and that he used rental vehicles to pick up drugs in Atlanta. (Doc. 655-1, at 10.) On May 6, 2022, using geo-location tracking of a cellphone and surveillance of Eaker and Stacy Eller ("Eller"), Eaker's girlfriend and co-defendant in this matter, investigators observed Eaker and Eller meet with one of Eaker's main distributors, rent a Nissan pickup truck, go to a storage facility, go to Ballard Place, and then "travel[] to the area of Atlanta, Georgia where Eaker's unidentified source of supply for illicit drugs [was] located." (*Id.* at 26–27.) Based on the geo-location data and investigators' observations, when Eaker and Eller left Atlanta, Georgia, they drove to the residence of a known methamphetamine distributor. (*Id.* at 27.) The Affidavit did not provide any observations or facts about Eaker, Eller, or Defendant's actions while at Ballard Place—merely that Eaker and Eller "went to [Ballard Place]." (*Id.*)

Like the affidavit in *Fitzgerald*, this Affidavit has not: (1) established that Defendant had a recent criminal history, (2) provided firsthand evidence that Defendant was part of Eaker's drug-trafficking organization ("DTO"), or (3) demonstrated that Defendant's residence was used as a stash house. Although the Affidavit stated that, before going to Ballard Place, Eaker met with one of his distributors, it provided no facts about that meeting. It also failed to provide any evidence of what occurred at Ballard Place during the visit at issue. Evidence that a suspect stopped one time at his brother's house before driving to a source of supply in Atlanta does not establish probable cause to search that house. The Affidavit failed to provide sufficient direct or circumstantial evidence that there was a fair probability that contraband or evidence of a crime would be found at Ballard Place. *See Sanders*, 106 F.4th at 461. Accordingly, the Defendant's

[2] As explained previously, this is Defendant's brother and co-defendant, not Defendant.

objection to the conclusion that the search warrant lacked probable cause to search Ballard Place will be **SUSTAINED**.

### C. *Leon* Good-Faith Exception

Finally, Defendant objects to the R&R's conclusion that the *Leon* good-faith exception applies to both Church Street and Ballard Place, arguing that the Affidavit in support of the search warrant of both residences was bare bones[3] and that the Sixth Circuit's holdings in *United States v. Ward*, 967 F.3d 555 (6th Cir. 2020), and *United States v. Hython*, 443 F.3d 480 (6th Cir. 2006), warrant a finding that the good-faith exception does not apply. (Doc. 730, at 13–19.)

Courts exclude unlawfully seized evidence to remedy the government's violation of the Fourth Amendment. *See Sanders*, 106 F.4th at 467. The exclusionary rule "exists to deter the misconduct of police officers—not judges." *United States v. Davis*, 84 F.4th 672, 678–79 (6th Cir. 2023). Therefore, "a court will suppress evidence obtained through an officer's deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Sanders*, 106 F.4th at 467 (citation omitted). Exclusion is unwarranted though "if an officer acts with an objectively reasonable good-faith belief that her conduct is lawful[.]" *Id.* (citation omitted). "[S]uppression is not an available remedy when officers conduct a search in good faith reliance on a judicially authorized warrant." *Id.* at 468. That is because "any error in the probable cause calculus likely belongs to the judicial officer issuing the warrant, not the law enforcement officer seeking it, thereby undermining the grounds for exclusion based on misconduct." *Id.*

[3] Although there are other exceptions to the *Leon* good-faith exception, the parties only addressed the bare bones affidavit exception. (*See* Docs. 689, at 8–9; 725, at 31.) Accordingly, the Court will only address this theory.

The *Leon* good-faith exception has its own exceptions, including the "bare bones affidavit" exception. *Id.* A bare bones affidavit will prevent application of the good-faith exception when the affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* An affidavit is bare bones if it is either "completely devoid of any nexus between the illegal activity and the place to be searched or the item to be seized, . . . or merely state[s] suspicions, or conclusions without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge." *Id.* However, "where an affidavit presents a modicum of evidence, however slight showing *some* connection, regardless of how remote it may have been between the criminal activity at issue and location of the search, . . . there exists a minimally sufficient nexus necessitating application of the good faith rule[.]" *Id.* at 469. Courts "read the affidavit holistically and examine the totality of the circumstances in making this inquiry." *United States v. Ward*, 967 F.3d 550, 554 (6th Cir. 2020).

Defendant relies on *Hython* and *Ward* to argue that the good-faith exception should not apply. In *Hython*, the warrant affidavit did not include the date the one controlled buy occurred, "contain[ed] no indication of ongoing investigation, subsequent or previous controlled buys, or further surveillance of the address or the female supplier." 443 F.3d at 488. The Sixth Circuit stated that the inference that connected the "event in the affidavit with an insufficiently substantiated assumption about police practice" was not a valid basis to invoke the good-faith exception. *Id.* at 489 (discussing that the good-faith exception could not rescue a search warrant affidavit that relied on an undated controlled buy and the court inferred that the controlled buy occurred recently based on assumed standard police practices).

In *Ward*, the Sixth Circuit affirmed the district court's holding that the good-faith exception did not apply. 967 F.3d at 552. The *Ward* affidavit stated only a few facts: "(1) police discovered undated text messages indicating that [defendant] sold [another individual] heroin and crack-cocaine [at the other individual's] residence sometime before [that individual's] death;" (2) that roughly six-months later, "police found in [defendant's] trash an unidentified quantity of loose marihuana, cigar wrappers, and a plastic bag containing residue of an unidentified, purportedly illicit substance, and saw two unidentified males around [defendant's] home; and (3) defendant was previously charged with drug and weapons offenses." *Id.* at 554 (citation modified). The Sixth Circuit stated that the "lone trash pull . . . six months after [an individual's] death" was insufficient for the good-faith exception to apply, but it "would be different if law enforcement here conducted the trash pull earlier [to the death of the individual], or if they searched [defendant's] trash more than once." *Id.* at 556. It further stated that "[t]he affidavit here does not provide evidence of the volume or continuity" of a "continual, ongoing drug-trafficking operation." *Id.*

Unlike the affidavits in *Hython* and *Ward*, Agent Mills's affidavit is not bare bones, especially when viewed holistically and taking into consideration the totality of the circumstances. The warrant affidavit in this case provides significant factual details about how Eaker's DTO operated and various observations that law enforcement made over the course of eleven months. (*See* Doc. 655-1.) The information in this Affidavit is supported by informants, information gathered from text messages between Eaker and members of the DTO, investigators' observations, and data collected from various tracking systems. (*See id.*) The Affidavit supports that the DTO was a continual and ongoing operation that brought "multi-kilogram quantities of methamphetamine and heroin/fentanyl" "every one to two weeks" to distribute in the

Chattanooga area. (*Id.* at 9–10.) Additionally, according to the Affidavit, the amount of contraband that was purchased weekly was valued in the tens of thousands of dollars. (*See id.* at 10, 13 (stating that Eaker traveled with $60,000 "for the purpose of resupplying with illicit drugs to bring back for distribution in the area of Chattanooga, Tennessee").) Based on these facts, the Affidavit contained extensive facts regarding the DTO's operations that would allow a reasonably well-trained officer to "conduct a search in good faith reliance on a judicially authorized warrant." *Sanders*, 106 F.4th at 468.

Looking specifically at Church Street, there are facts that after April 14, 2022, Eaker was observed driving there on "multiple occasions" and that he traveled to Church Street on May 9, 2022. (Doc. 655-1, at 23–24, 27–28.) Also, in an April 29, 2022 interview with a confidential informant[4], he/she told investigators that Defendant had paid for Church Street "using drug proceeds." (*Id.* at 26.) Although the R&R found the informant's reliability a "wash" (Doc. 723, at 11), the informant's information provides some additional support for a connection between Church Street and criminal activity that a reasonably trained officer could have relied on.

As to Ballard Place, similar to Church Street, the Affidavit stated that after April 14, 2022, Eaker was observed driving there multiple times. (Doc. 655-1, at 23–24.) Ballard Place has more than a "modicum of evidence" connecting it to criminal activity. *Sanders*, 106 F.4th at 469. As discussed above, a confidential informant detailed to Agent Mills how Eaker's DTO operated—they would rent cars and drive them to Atlanta to purchase contraband to distribute in

---

[4] In the Affidavit, this confidential informant is disclosed to have "provided historical and current information that has been independently corroborated by investigators throughout the investigation[,]" and that his/her "information has led to seizures of controlled substances." (Doc. 655-1, at 25 n.12.) It further stated that this confidential informant "has not always been completely honest with law enforcement, mainly in an effort to minimize his/her own involvement in criminal activities." (*Id.*)

the Chattanooga area. (*Id.* at 9–14, 21–22.) On May 6, 2022, Eaker engaged in that pattern of activity. (*Id.* at 27.) He rented a car. (*Id.* at 26.) Then investigators observed him stopping at Ballard Place; geo-location data from a cellphone also indicated he stopped at Ballard Place. (*Id.* at 27.) After leaving Ballard Place, he traveled in the rental vehicle "to the area of Atlanta, Georgia, where Eaker's unidentified source of supply for illicit drugs [was] located." (*Id.*) The Affidavit established a minimally sufficient nexus between criminal activity and Ballard Place such that a reasonably trained officer could rely on it. Accordingly, Defendant's objections to the application of *Leon's* good-faith exception will be **OVERRULED**.

## IV. CONCLUSION

For the reasons stated above, Defendant's objections to: (1) the magistrate judge's denial of a *Franks* hearing is **OVERRULED**, (2) the conclusion that the search warrant lacked probable cause as to Ballard Place is **SUSTAINED**, and (3) the conclusion that the *Leon* good-faith exception applied to the Church Street search and Ballard Place is **OVERRULED**.

**SO ORDERED.**

**/s/*Travis R. McDonough***
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**